FILED
PAIGE TRAUTWEIN, CLERK
FEB 22 2021

William E. Rideg
RIDEG LAW OFFICE, PLLC
P.O. Box 701
Missoula, MT 59806
(406) 626-1500
william@rideglaw.com
*Attorneys for Plaintiffs*

### MONTANA TWENTY-FIRST JUDICIAL DISTRICT COURT, RAVALLI COUNTY

| | |
|---|---|
| ANNA BERNSTEIN,<br><br>Plaintiff,<br><br>-vs-<br><br>MARCUS DALY MEMORIAL HOSPITAL CORPORATION,<br><br>Defendant. | Cause No.: DV-21-87/1<br>Dept 2<br>Hon. Judge: Jennifer B. Lint<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

COMES NOW, Anna Bernstein, by and through her attorney, William E. Rideg, of Rideg Law Office, PLLC, and alleges as follows:

### I. PARTIES

a. Plaintiff, Anna Bernstein ("Ms. Bernstein"), was at all times relevant to this action, a resident of Ravalli County, Montana.

b. Defendant, Marcus Daly Memorial Hospital Corporation ("Marcus Daly"), is a Domestic Non-Profit Corporation with a business address of 1200 Westwood Drive, Hamilton, Montana. At all times relevant to this action, a resident of Ravalli County, Montana.

## II. VENUE & JURISDICTION

a. This Court has jurisdiction over all matters asserted in this Complaint, and Ravalli County is the proper venue for trial pursuant to §§ 25-2-118, 25-2-121, and 25-2-122, MCA.

## III. FACTUAL BACKGROUND

a. Anna Bernstein was employed by Marcus Daly from June 24, 2019, through mid-November, 2020, as a Marketing Specialist. Her annual salary, including fringe benefits, was approximately $57,000.

b. Ms. Bernstein was an excellent employee. Within a year of her employment, Ms. Bernstein's work led to an increase in organic internet search traffic by 52%; an increase of Marcus Daly followers on Facebook of 157%; an increase of Marcus Daly's "likes" on Facebook by 176%; an increase of traffic to Marcus Daly's Google My Business by over 500%; and, perhaps most importantly, securing a grant of $4,000 worth of Personal Protective Equipment for Marcus Daly medical staff.

c. Despite Ms. Bernstein's excellent performance, she was subject to unrelenting harassment and stalking by her supervisor, Ms. Amy James-Linton, from her first day on the job.

d. Part of Ms. Bernstein's job was to understand the various services offered by Marcus Daly. This required Ms. Bernstein to interact with the departments within the hospital. Despite this, Ms. James-Linton generally required Ms. Bernstein to remain in her office

and limited the interactions Ms. Bernstein could have with other people.

e. Ms. Bernstein's office was located adjacent to Ms. James-Linton's office, permitting Ms. James-Linton the opportunity to watch Ms. Bernstein closely.

f. James-Linton demonstrated disturbing behavior towards Ms. Bernstein, including:

- Continuous contact via phone and text after business hours, including evenings and weekends. These calls were made from Ms. James-Linton's personal cell to Ms. Bernstein's personal cell, to such a degree that Ms. Bernstein had to block Ms. James-Linton's phone number from 5 p.m. Friday through 8 a.m. Monday;
- Continuous texting contact regarding non-business matters, including links to various articles about stalkers in Missoula and the Bitterroot Valley, knowing that Ms. Bernstein had been a victim of stalking;
- Engaging Marcus Daly's IT technicians to monitor and obtain Ms. Bernstein's emails:
- Continually asking Ms. Bernstein whom she is dating; and
- Restricting Ms. Bernstein's interactions while at work.

g. In the fall of 2019, Ms. Bernstein was the victim of a stalker, a fact learned by Ms. James-Linton, who then, without permission from Ms. Bernstein, shared this news with multiple Marcus Daly employees, including HR.

h.  The 2019 stalking incidents, while frightening to Ms. Bernstein, did not temporarily or permanently affect her physical or mental health.

i.  Before, during and after the sentencing and conviction of Ms. Bernstein's stalker, Ms. James-Linton continually pestered Ms. Bernstein with questions, comments, and internet stories about episodes of alleged stalking in Western Montana. This deluge of information continued despite Ms. Bernstein's persistent pleas for Ms. James-Linton to stop speaking about the subject matter, as it caused great distress for Ms. Bernstein.

j.  Ms. James-Linton maintained her efforts to self-involve herself in Ms. Bernstein's personal life by systemically calling and texting Ms. Bernstein during non-work hours, inquiring about Ms. Bernstein's romantic involvements, and other personal matters. Again, Ms. Bernstein demanded that Ms. James-Linton keep out of her personal life.

k.  Ms. James-Linton required Ms. Bernstein to submit her brother's cell phone number to her, allegedly for emergency purposes. Ms. Bernstein was very hesitant to provide any contact information to Ms. James-Linton, based on perceived intentions of invading her privacy. Once the phone number was provided, Ms. James-Linton badgered Ms. Bernstein stating that, should Ms. Bernstein fail to complete a task required by Ms. James-Linton, she would threaten to call Ms. Bernstein's brother.

l.  Upon information and belief, Ms. James-Linton requested Marcus

        Daly staff members to keep tabs on Ms. Bernstein while at work in an effort to minimize Bernstein's interactions with other employees. Ms. James-Linton was also known to state to Marcus Daly employees that Ms. Bernstein was unreliable, untrustworthy, and needed an "eye kept on her."

m. Despite Ms. Bernstein's objections, on several occasions, Ms. James-Linton directed Ms. Bernstein to use photographs for Marcus Daly advertising to which Marcus Daly failed to have lawful usage rights.

n. Ms. James-Linton appeared in the alley behind Ms. Bernstein's house after work hours while Ms. Bernstein was home. Ms. James-Linton wore a baseball cap pulled down over her face, mirrored aviator sunglasses, and her hair tightly pulled back to conceal her identity.

o. Despite Ms. Bernstein having an appointment to obtain a flu shot the following week, on or about November 8, 2019, Ms. James-Linton demanded Ms. Bernstein obtain an influenza shot immediately from Ms. Alida Merritt, Marcus Daly's Infection Control Director. The shot, administered in haste in Ms. Merritt's personal office, and not an appropriately sterile environment, was improperly administered, injuring Ms. Bernstein's shoulder. As a result of Ms. Merritt's negligence, Ms. Bernstein suffered an avoidable shoulder injury that required months to fully recover, including ongoing physical therapy.

p. Ms. James-Linton used her authority over Ms. Bernstein as a cudgel to control Ms. Bernstein. For example, on August 17, 2020, Ms. James-Linton presented a Written Warning Form to Ms. Bernstein for alleged missteps that were grounded neither in fact nor reality.

q. Ms. Bernstein responded to the August 17, 2020, Written Warning Form in detail. Ms. Bernstein's response included her persistent and chronic health conditions directly caused by Ms. James-Linton's bullying, micromanaging behavior.

r. Ms. Bernstein repeatedly reported her persistent and chronic health conditions to Marcus Daly throughout her employment.

s. Ms. Bernstein did not suffer persistent and chronic health conditions prior to working for Ms. James-Linton.

t. Ms. Bernstein repeatedly submitted grievances, both in writing and verbally, to her superior, Ms. James-Linton, and others at Marcus Daly regarding Ms. James-Linton's behavior.

u. Upon information and belief, Ms. James-Linton demonstrated similar behavior prior to Ms. Bernstein going to work for Marcus Daly in 2019.

v. Thus, as of Ms. Bernstein's hire date and thereafter, Marcus Daly was aware, or should have been aware, that Ms. James-Linton was an unfit employee.

w. Despite having knowledge or notice of Ms. James-Linton's erratic, unprofessional, and harassing behavior, Marcus Daly allowed Ms.

James-Linton to remain in a position of authority over Ms. Bernstein and others.

x. The constant badgering, controlling behavior exhibited by Ms. James-Linton had a profound effect on Ms. Bernstein. She suffered, and continues to suffer, physical and mental hardships as a result of Ms. James-Linton's behavior and as a result of Marcus Daly's failure to protect Ms. Bernstein.

y. By August 2020, after months of reporting Ms. James-Linton's behavior, Marcus Daly finally hired an independent investigator to look into Ms. James-Linton's behavior.

z. Marcus Daly put Ms. Bernstein on paid leave during the investigation. While Marcus Daly's purpose for the leave was unclear, it did not directly address any of Ms. Bernstein's physical or mental conditions.

aa. On Friday, September 11, 2020, Rebecca Conroy-Bargfrede, Chief People Officer at Marcus Daly, composed a letter to Ms. Bernstein informing her that the investigation was complete, that Ms. James-Linton was terminated, and that Ms. Bernstein was expected back to work on Monday, September 14, 2020.

bb. Even after Ms. James-Linton's termination, Ms. Bernstein continued to suffer from persistent and chronic mental and physical conditions.

cc. After Ms. Bernstein's return to work, Marcus Daly assured Ms. Bernstein that she would no longer have to interact with Ms. James-Linton. However, soon after receiving this assurance, Ms.

          Bernstein had a brief interaction with Ms. James-Linton on Marcus Daly property.

dd.   After Ms. Bernstein's return to work, Marcus Daly altered Ms. Bernstein's job classification from salaried to hourly. No discernable reason was provided for the change.

ee.   On or about October 11, 2020, Ms. Bernstein was provided Family & Medical Leave Act ("FMLA") documents pursuant to 29 U.S.C. § 2601, et seq.

ff.   In a letter describing Ms. Bernstein's medical condition related to FMLA, Ms. Bernstein's medical care provider diagnosed severe anxiety and post-traumatic stress disorder directly related to Ms. Bernstein's previous supervisor, Ms. James-Linton.

gg.   Ms. Bernstein's medical care provider specifically stated that the work environment at Marcus Daly was a trigger for Ms. Bernstein's conditions.

hh.   As Ms. Bernstein did not have more accrued paid time off, she was unable to take more than one month of FMLA leave.

ii.   Upon her return, Ms. Bernstein provided ample notice, including her medical care provider's FMLA letter, that she suffered from a condition that substantially limited her major life activities.

jj.   At numerous times throughout her employment, Ms. Bernstein informed Marcus Daly of her ongoing health conditions, which substantially limited Ms. Bernstein's major life activities.

kk.   At no time prior to Ms. Bernstein's departure from Marcus Daly's employment did anyone at Marcus Daly offer to accommodate Ms.

ll. Bernstein's disability, including allowing Ms. Bernstein to perform her job duties remotely.

ll. Ms. Bernstein's job duties centered on web development, web advertising, and other duties that do not require her physical presence at the hospital. Despite this, Marcus Daly did not offer remote work as an accommodation to Ms. Bernstein.

mm. Ms. Bernstein repeatedly requested to work remotely throughout her employment at Marcus Daly. Each request was either ignored or denied.

nn. As a result of Marcus Daly's actions, including but not limited to placing her under the supervision of an unfit employee, ignoring Ms. Bernstein's pleas for assistance in dealing with Ms. James-Linton, changing Ms. Bernstein's job classification from salary to hourly, failing to accommodate Ms. Bernstein's disability, and forcing Ms. Bernstein to return to work, Ms. Bernstein was left with no other reasonable choice but to leave her employment with Marcus Daly.

oo. Throughout its employment of Ms. Bernstein, Marcus Daly knew that Ms. James-Linton's continued supervision of Ms. Bernstein created a high probability of injury to Ms. Bernstein. Despite this knowledge, Marcus Daly either deliberately proceeded to act in conscious disregard of the probability of injury to Ms. Bernstein or deliberately proceeded to act with indifference to the high probability of injury to Ms. Bernstein.

## IV. CAUSES OF ACTION

## COUNT ONE - WRONGFUL DISCHARGE FROM EMPLOYMENT ACT (CONSTRUCTIVE DISCHARGE)

a. Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

b. Plaintiff was a non-probationary "employee" as defined by § 39-2-903(3), MCA.

c. "Constructive discharge," as defined by § 39-2-903(1), MCA, means the voluntary termination of employment by an employee because of a situation created by an act or omission of the employer which an objective, reasonable person would find so intolerable that voluntary termination is the only reasonable alternative.

d. Defendant created multiple situations, outlined above, that left Plaintiff with no reasonable alternative but to voluntary terminate her employment on or about November 13, 2020, in violation of § 39-2-904, MCA.

e. As a result of Defendant's wrongful discharge, Plaintiff is entitled to damages, including lost wages and fringe benefits, plus interest, pursuant to § 39-2-905, MCA.

## COUNT TWO – PUNITIVE DAMAGES

a. Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

    b.    Defendant acted knowingly, deliberately, intentionally, and maliciously without regard for Plaintiff's rights, interests, and well-being.

    c.    Defendant exhibited a reckless or callous disregard for Plaintiff's personal well-being, physical and mental health, and in violation of Defendant's own policies.

    d.    Defendant's unlawful acts and omissions were willful and/or reckless; Defendant deliberately acted with indifference to the high probability of injury to Plaintiff. Such conduct justifies the imposition of punitive damages under §§ 27-1-220, 221, MCA, in the amount sufficient to punish Defendant and to serve as a warning to other persons and legal entities similarly situated that conduct of the kind engaged in by Defendant is unacceptable in our society and will not be tolerated.

## COUNT THREE – NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

    a.    Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

    b.    Infliction of emotional distress arises where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent act or omission. *Sacco v. High Country Indep. Press, Inc.*, 271 Mont. 209 (1995).

    c.    Negligent and intentional infliction of emotional distress are

recognized and may be pled as a separate cause of action in the courts of Montana. *Sacco v. High Country Indep. Press, Inc.*, 271 Mont. 209 (1995). "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Czajkowski v. Meyers*, 339 Mont. 503 (2007).

d. Plaintiff suffered serious and severe emotional distress as a reasonably foreseeable consequence of Defendant's negligence related directly to the conduct and actions surrounding Plaintiff.

e. Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and should be considered intolerable in a civilized society.

f. Plaintiff was injured when they suffered serious and severe emotional distress as a consequence of Defendant's intentional and negligent acts. Plaintiff suffered damages and continues to suffer damages.

g. Defendant is liable to Plaintiff for damages as a result of Defendant's actions.

## COUNT FOUR – VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

a. Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

b. Defendant was at all times relevant to this Count Four an "employer" as defined by the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601, et seq.

c. Plaintiff required leave from her job as a result of serious health conditions. Some or all of this leave was designated as leave pursuant to the FMLA, 28 U.S.C. § 2601, et seq.

d. Defendant retaliated against, interfered with, restrained, and denied the exercise of, or the attempt to exercise, rights of the Plaintiff under the FMLA, and Defendant's actions against Plaintiff were contrary to the provisions of the FMLA.

e. Defendant is liable to Plaintiff for damages, interest, liquidated damages, and attorney's fees pursuant to 28 U.S.C. § 2617.

## COUNT FIVE – ASSAULT AND BATTERY

a. Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

b. Assault requires imminent apprehension of harmful or offensive contact. *Collins v. Dept. of Justice, Div. of Highway Patrol*, 232 Mont. 73 (1988).

c. Battery requires contact that offends a reasonable sense of personal dignity. *Smith v. Roosevelt Co.*, 242 Mont. 27 (1990).

d. Defendant committed assault when their agent, Ms. Merritt, caused imminent apprehension of harmful or offensive contact in Plaintiff by subjecting her to an influenza vaccine in an unsafe manner in an unsafe location within Defendant's premises.

e. Defendant committed battery when her contact upon Plaintiff

offended her reasonable sense of personal dignity by subjecting her to an influenza vaccine in an unsafe manner in an unsafe location within Defendant's premises.

f.  As a result of Defendant's assault and battery, Plaintiff suffered and continues to suffer damages.

### COUNT SIX – NEGLIGENT HIRING, TRAINING, AND SUPERVISION

a.  Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

b.  Montana recognizes the claim of negligent hiring, training, retention, and supervision. See *Maguire v. State*, 254 Mont. 178 (1992). An employer is liable for negligent hiring, training, retention, and supervision of an employee where the employer becomes aware or should have been aware that the employee is unfit, and the employer fails to take action. *Bruner v. Yellowstone County*, 272 Mont. 261 (1995). The employer's negligence must be the proximate cause of plaintiff's injuries. *Peschel v. City of Missoula*, 664 F. Supp. 2d. 1149 (D. Mont. 2009).

c.  Defendant was aware or should have been aware that the Ms. James-Linton was unfit for the positions she occupied.

d.  Defendant failed to take meaningful action with regard to the employee.

e.  As a direct and proximate cause of Defendant's failure to take action with regard to this employee, Plaintiff suffered damages and continues to suffer damages.

COMPLAINT AND JURY DEMAND                                                   14

## COUNT SEVEN – NEGLIGENCE

a. Plaintiff repeats and incorporates by reference each and every allegation in all preceding paragraphs.

b. Negligence occurs where a legal duty is present, a breach of that duty occurs, the breach causes harm, and the harm results in damages to another. *Krieg v. Massey*, 239 Mont. 469; *Prosser and Keeton on Torts*, §30, 164-165 (1984). Whether a legal duty is owed depends on whether the action was foreseeable. *Poole v. Pool*, 299 Mont. 453 (2000). Duty is measured "by the scope of the risk which negligent conduct foreseeably entails." *Lopez v. Great Falls Pre-Release Serv., Inc.*, 295 Mont. 416 (1999).

c. Defendant had a legal duty to exercise the level of care that a reasonable and prudent person would have used under the circumstances. Defendant caused Plaintiff harm by its acts and omissions, including but not limited to knowingly allowing ongoing supervision by Ms. James-Linton, knowingly allowing Plaintiff to undergo repeated and known bullying, aggravating, and heinous behavior by Ms. James-Linton, knowingly requiring Plaintiff to undergo a simple medical procedure in an unsafe and unsanitary manner, knowingly allowing Plaintiff to interact with Ms. James-Linton after having knowledge of Ms. James-Linton's misdeeds towards Plaintiff. These acts, among others herein stated, constitute a clear breach of that duty.

d. Defendant should have reasonably foreseen that Plaintiff would be damaged by her negligent acts. Plaintiff, as an employee, was

placed within the foreseeable zone of risk created by Defendant's negligence.

a. As a direct and proximate cause of Defendant's breach of its legal duty, Plaintiff was damaged and continues to sustain damages.

WHEREFORE, the Plaintiff prays for the following relief:

1. Damages in an amount to be proven at trial;
2. Reasonable attorney's fees and costs;
3. Interest at the statutory rate; and
4. Such other relief that this Court may deem just.

DATED this 18th day of February, 2021.

RIDEG LAW OFFICE, PLLC

By: /s/William E. Rideg

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

DATED this 18th day of February, 2021.

RIDEG LAW OFFICE, PLLC
By: /s/William E. Rideg